IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| RICK A. HOLMAN individually, and on behalf of WOLF CREEK HOLDINGS OF SPOKANE LLC, a Washington Limited Liability Company, | ) ) ) ) ) | No. 33114-8-III |
| Respondents, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| BRIAN W. BRADY and MOUNTAIN BROADCASTING, LLC, a Washington Limited Liability Company, | ) ) ) ) ) | |
| Appellants. | ) | |

SIDDOWAY, J. — One procedural issue and two issues of contract construction, summarily resolved in the trial court, are raised by this dispute among Rick Holman and Brian Brady, their jointly-owned limited liability company (LLC), and its lessee, which is controlled by Mr. Brady. We hold in Mr. Holman's favor that the trial court properly denied the motion to dismiss the derivative claims he asserted on behalf of the LLC. We hold in the lessee's favor that its notice of nonrenewal complied with the terms of its lease from the jointly-owned LLC. We hold in Mr. Holman's favor that under the terms of the LLC agreement, Mr. Brady lacked authority to agree, unilaterally, to new lease terms on the LLC's behalf.

We remand for further proceedings consistent with this decision.[1]

FACTS AND PROCEDURAL BACKGROUND

Rick Holman and Brian Brady are each 50 percent member-owners of Wolf Creek Holdings of Spokane LLC, which was established in October 1997. Wolf Creek's sole asset is a building that it has leased at all relevant times to Mountain Broadcasting LLC as a television studio and for related uses. Mountain is owned by Northwest Broadcasting Inc. and Northwest Broadcasting LP both of which are controlled by Mr. Brady.

The original lease between Wolf Creek and Mountain was entered into on January 12, 1998, and it was amended on March 1, 1999. It provides for an initial 15-year term that is automatically extended for additional 5-year terms "unless the Tenant shall give notice to the Landlord at least ninety (90) days prior to the Extension Date that the Tenant elects that the term of this Lease not be extended." Clerk's Papers (CP) at 39.

During the initial 15-year term of the lease, Mountain expressed unhappiness about the CPI[2]-adjusted rent, claiming it had become grossly out of line with market rents. Jon Rand, the general manager of Mountain, wrote letters to Mr. Brady and Mr.

---

[1] During our workup of this appeal, we asked the parties to address whether the trial court had abused its discretion in certifying its summary judgment decisions as final under CR 54(b). It may have, but both sides ask that we decide the appeal, which we can and will do under RAP 2.3(b)(4).

[2] Consumer price index.

Holman in 2005 and 2009 seeking relief. Unmoved by the requests, Mr. Holman, on behalf of Wolf Creek, periodically reminded Mountain of the rent increases that would go into effect on January 1 of the upcoming year.

In anticipation of the January 11, 2013 expiration of the original 15-year lease term, Mountain's lawyers dispatched a notice of nonrenewal on September 20, 2012. It was dated September 21, was signed by Mr. Rand, and was addressed to "Mr. Brian Brady, President, Northwest Broadcasting, Inc.," at Northwest Broadcasting's Okemos, Michigan, address. CP at 178. The letter said it was being sent to Mr. Brady "in your position as a member of Wolf Creek Holdings of Spokane LLC." CP at 178. It was sent for overnight delivery via Federal Express and was received by Mr. Brady on September 21.

Consistent with Mountain's prior complaints, the reason Mr. Rand gave for its decision not to renew was the above-market rent. The letter said that Mountain was then paying $23.52 per square foot on a triple net basis, that the rent would increase to $24.35 per square foot if the lease were extended, and that market research indicated that the "market for similar properties is in the $6-9 range (also on a triple net basis)." CP at 178. Mr. Rand proposed a new three-year lease under which Mountain would pay $9 per square foot.

On October 4, 2012, Mr. Brady responded to Mr. Rand, acknowledging Mountain's election not to extend the lease. He counter proposed a five-year lease at a

3

rate of $15 per square foot with annual CPI adjustments as "more appropriate." CP at 131. Mountain made a further counterproposal and Mountain and Mr. Brady soon agreed on a new three-year lease with a CPI-adjusted rental rate beginning at $14 per square foot.

On November 30, Mr. Holman learned for the first time of Mountain's nonrenewal notice and the resulting negotiations, through a letter from Mr. Brady. Despite Mr. Brady's representation that the rental rate under the new lease "is more than 150% of the average market rate," CP at 127, Mr. Holman objected to the proposed terms for a new lease. Over Mr. Holman's objection, Mr. Brady signed a new lease with Mountain on behalf of Wolf Creek on or about January 10, 2013.

## Procedural History

On March 8, 2013, Mr. Holman, individually and on behalf of Wolf Creek, filed suit against Mr. Brady and Mountain. The complaint alleged five causes of action. The first, a derivative claim on behalf of Wolf Creek, was that Mountain was in breach of the 1998 lease on and after January 11, 2013, by failing to pay the rent required by that lease. According to Mr. Holman, Mountain's attempted notice of nonrenewal did not comply with the lease terms.

The second—an alternative derivative claim, if the notice of nonrenewal *was* effective—was that Mountain was in breach of the 1998 lease on and after January 11, 2013, by failing to pay holdover rent required by that lease. Mr. Holman contended that

4

Mr. Brady lacked authority to bind Wolf Creek to a new lease and Mountain was aware of that fact.

The three remaining causes of action were asserted against Mr. Brady as both a derivative claim and a claim by Mr. Holman, and were all based on an asserted breach of the Wolf Creek LLC agreement by Mr. Brady in unilaterally accepting the nonrenewal notice, entering into a new lease, and participating in Mountain's breach of the 1998 lease agreement for his personal gain. The legal claims asserted were for breach of the LLC agreement, breach of the covenant of good faith and fair dealing, and breach of his fiduciary duty.

Mr. Brady unsuccessfully moved to dismiss the complaint on several grounds, including an asserted failure to comply with the requirements of CR 23.1. The trial court construed the rule as not applying to LLCs.

Over 15 months later, the parties filed cross motions for summary judgment based on disputes over the meaning of key provisions of the LLC agreement and the lease. In December 2014, the court granted partial summary judgment in favor of Wolf Creek and Mr. Holman, concluding that they were entitled to judgment as a matter of law that Mountain's attempted notice of nonrenewal failed to comply with the notice provision of the lease, Mr. Brady breached the LLC agreement by treating Mountain's notice of nonrenewal as effective and negotiating a new lease, the 2013 lease was invalid, and Mountain was in breach of the 1998 lease.

5

Mr. Holman asked the court for a CR 54(b) certification and entry of a final judgment on the two contract claims, which the court provided. Although damages for Mountain's failure to pay the rent required by the 1998 lease on and after January 11, 2013, were to be determined at a later date, a judgment was entered awarding to Mr. Holman, individually, the fees and costs he had advanced in pursuing the derivative claim for breach of the lease.

Mr. Brady and Mountain appeal.

## ANALYSIS

Mr. Brady and Mountain assign error to the trial court's (1) denial of their motion to dismiss the derivative claims against Mountain,[3] (2) denial of their motion for summary judgment, (3) granting of Mr. Holman's motion for partial summary judgment, and (4) entry of judgment in favor of Mr. Holman individually. We first address the trial court's denial of the motion to dismiss the derivative claims, then turn to its decision on both sides' summary judgment motions dealing with the asserted breach of the 1998 lease, next turn to its decisions on both sides' summary judgment motions on the asserted breach of the LLC agreement, and finally turn to its entry of judgment in favor of Mr. Holman individually.

---

[3] Although the decision on the motion to dismiss was not mentioned in the superior court's CR 54(b) certification, it prejudicially affects decisions that have been appealed and Mr. Brady and Mountain are entitled to assign error to it. RAP 2.4(b).

6

### *I. Motion to dismiss derivative claims*

Mr. Brady's and Mountain's early motion to dismiss Mr. Holman's derivative claims contended that his complaint was required to comply with CR 23.1, but did not. It also contended that it is improper for a plaintiff to join derivative and personal claims. The trial court rejected both arguments, as do we.

### A. CR 23.1 does not apply

CR 23.1 requires verification of the complaint in "a derivative action brought by one or more shareholders or members to enforce a right of a *corporation* or of an *unincorporated association*." (Emphasis added.) It imposes the following pleading requirements: that the complaint allege the plaintiff was a shareholder or member at the time of the complained-of transaction or acquired its shares or membership thereafter by operation of law; that the action is not a collusive one to confer jurisdiction on the court; and the plaintiff's particular efforts, if any, to obtain relief from the directors, shareholders, or members. With the exception of the allegation of noncollusiveness, the same verification and virtually identical pleading requirements for derivative shareholder actions appear in the Washington Business Corporation Act, title 23B RCW, at RCW 23B.07.400(1) and (2). Mr. Brady and Mountain argue that Mr. Holman's complaint was not verified and did not allege that the action was not a collusive one to confer jurisdiction.

7

CR 23.1, in language virtually identical to the rule as it exists today, was adopted along with the other Civil Rules for Superior Court effective July 1, 1967. 71 Wn.2d xxiii, lxiii-lxiv.[4] At the time, limited liability companies did not exist. Wyoming and Florida would later enact legislation authorizing the creation of limited liability companies in 1977 and 1982, respectively, but uncertainty as to whether an LLC would be classified as a partnership for federal tax purposes kept most state legislatures on the sidelines until the 1990s. Susan Pace Hamill, *The Origins Behind the Limited Liability Company*, 59 OHIO ST. L.J. 1459, 1465-70 (1998). In 1988, the Internal Revenue Service issued Revenue Ruling 88-76, holding that because an LLC established in Wyoming lacked the corporate characteristics of continuity of life and free transferability of interests, it would be classified as a partnership rather than as a corporation. 1988-2 C.B. 360. Broad enactment of state laws authorizing LLCs followed. Hamill, 59 OHIO ST. L.J. at 1475-76.

The Washington Legislature first authorized the formation of limited liability companies in 1994. LAWS OF 1994, ch. 211, §§ 1001-04, at 1054. The initial LLC legislation included provisions for derivative LLC member actions. Former RCW 25.15.370-.385 (1994).[5] But unlike the procedure for derivative corporate

---

[4] By an order of the Washington Supreme Court dated April 28, 2015, CR 23.1 was amended so as to be gender-neutral. 182 Wn.2d 1233-34.

[5] Legislation enacted in 2015 repealed all of the then-existing provisions of

shareholder actions that the legislature had enacted only five years earlier,[6] and unlike

CR 23.1, the derivative LLC member action provisions did not include a verification

requirement. They also omitted any requirement to disclaim collusion to confer

jurisdiction.[7]

---

chapter 25.15 RCW and adopted new provisions. A staff summary of public testimony on the original bill explains:

> New LLC filings in Washington outnumber new corporation filings by a 7:1 ratio. Washington's current LLC law is similar to the original LLC law passed in 1994. The current LLC law should be changed to bring Washington's laws in line with similar laws in leading states and with current LLC business practices. This bill is the work of the Washington State Bar Association Partnership and LLC Law Committee in which 20 business lawyers from across the state took part in a line-by-line review of the current LLC law over several years. The proposed changes will make the LLC law more user friendly for many non-lawyers who form and operate LLCs. This bill promotes uniformity among LLCs and uniformity between Washington's LLC law and its other business entity laws.

Senate Bill Report, SENATE BILL 5030, 64th Leg. (2015) (as reported by the Senate Committee on Law & Justice). The law, based on later-proposed Substitute Senate Bill 5030, took effect on January 1, 2016. LAWS OF 2015, ch. 188, § 104. It does not affect actions commenced, proceedings brought, or rights accrued before that date. *Id.* at § 106.

[6] The statutory provision addressing procedure for derivative shareholder actions, codified at RCW 23B.07.400, was adopted by LAWS OF 1989, ch. 165, § 79. The prior business corporation act, former chapter 23A RCW, had included a derivative action provision that contained standing requirements, but no pleading requirements. Former RCW 23A.08.460 (1965).

[7] Professor Tegland has observed that a verified disclaimer of collusion is required by the federal rule on which CR 23.1 was patterned in order to prevent parties from acquiring diversity jurisdiction where federal jurisdiction would not otherwise exist, and that "[t]he provision is unlikely to become an issue in Washington's superior courts, which are courts of general jurisdiction." 3A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR 23.1, at 561-62 (6th ed. 2013) (citing 7C CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 1830).

By its terms, CR 23.1 does not apply to Mr. Holman's action, which was not brought "to enforce a right of a corporation or of an unincorporated association" but was brought, instead, to enforce a right of a limited liability company. A limited liability company is not a corporation[8] and it is not an unincorporated association.[9]

Mr. Brady nonetheless points to RCW 1.16.080, which was amended in 1996 to provide that "[u]nless the context clearly indicates otherwise, the terms 'association,' 'unincorporated association,' and 'person, firm, or corporation,'" shall be construed to include LLCs. *See* LAWS OF 1996, ch. 231, § 1. The statutory change is unpersuasive for two reasons. First, the purpose of the 1996 legislation was to make technical changes and clarifications to the 1994 LLC legislation based on a review by the Washington Bar Association, and the legislation was primarily devoted to making changes in chapter 25.15 RCW—yet the legislature made no change to the derivative LLC member action

---

[8] "A limited liability company is not a corporation," but "ha[s] 'some features of corporations and some features of partnerships.'" *United States v. Hagerman*, 545 F.3d 579, 581 (7th Cir. 2008) (quoting *McNamee v. Dep't of the Treasury*, 488 F.3d 100, 107 (2d Cir. 2007)). Washington's House Committee on the Judiciary also explained the difference between LLCs, corporations, and other entities in support of the 1994 enactment of what became chapter 25.15 RCW. FINAL B. REP. ON SECOND SUBSTITUTE H.B. 1235, at 1-3, 53rd Leg. (Wash. 1994).

[9] "An unincorporated association generally is formed by the voluntary action of a number of individuals in associating themselves together under a common name for the accomplishment of a lawful purpose. It is 'a body of individuals acting together for the prosecution of a common enterprise without a corporate charter but upon methods and forms used by corporations.'" *Halme v. Walsh*, 192 Wn. App. 893, 904, 370 P.3d 42 (2016) (quoting 6 AM. JUR. 2D Associations and Clubs § 1 (2008)).

10

provisions. FINAL B. REP. ON ENGROSSED SECOND SUBSTITUTE S.B. 6168, 54th Leg.

(Wash. 1996); LAWS OF 1996, ch. 231, §§ 1-13. Second, and more fundamentally,

RCW 1.16.080 provides general definitions for purposes of the entire code, but does not

purport to define terms for purposes of court rules. In the 20 years since the legislature

saw fit to include LLCs in general definitions under RCW 1.16.080, our Supreme Court

has not seen fit to amend CR 23.1 to apply to derivative LLC member actions.

Mr. Brady also cites two decisions by lower federal courts that have applied

Federal Rule of Civil Procedure (FRCP) 23.1 to derivative claims asserted by a member

on behalf of an LLC: *Taylor v. Moskow*, 2013 WL 5508157 at *4 (D. Mass. 2013), and

*Weeks Landing LLC v. RCMP Enterprises LLC*, 439 B.R. 897, 913 (Bankr. M.D. Fla.

2010). Neither decision engages in any critical examination of the issue. And neither

involves the legislative history that we encounter: two statutes, adopted close in time and

well after CR 23.1, which explicitly impose different pleading and verification

requirements for derivative actions depending on whether the derivative claim is asserted

by a shareholder on behalf of a corporation, or by a member on behalf of an LLC.

Court rules and statutory provisions should be harmonized and both given effect if

possible. *State v. Ryan*, 103 Wn.2d 165, 178, 691 P.2d 197 (1984) (where they conflict,

the court's rulemaking power is supreme). The plain language of a court rule does not

require construction. *State v. Punsalan*, 156 Wn.2d 875, 879, 133 P.3d 934 (2006)

(quoting *State v. Delgado*, 148 Wn.2d 723, 727, 63 P.3d 792 (2003)). Since

11

CR 23.1 was adopted before LLCs were even a gleam in a tax lawyer's eye, and LLCs are different from corporations in ways that could explain why the legislature would enact different derivative action procedures for them (just as it has for limited partnerships[10]), we will not construe CR 23.1 as applying more broadly than its plain language.

### B. There was no improper joinder of claims

Mountain also alleges Mr. Holman improperly joined derivative and personal claims. He relies on two distinct lines of cases: *Hames v. Spokane-Benton County Natural Gas Co.*, 118 Wash. 156, 203 P. 18 (1922) and other early Washington cases, and a more recent collection of federal decisions out of the Southern District of New York.

*Hames* disallowed the joinder of such claims based on procedural requirements then imposed by statute: former Remington's Code § 296. As described by the court, the statute permitted the joinder in the same suit of two causes of action in some cases, specifying the types of cases in which joinder was permitted but with all joinder subject to the following proviso:

_____

[10] RCW 25.10.706, authorizing derivative actions to enforce a right of a limited partnership, requires neither a verified complaint nor a disclaimer of collusion to confer jurisdiction.

"But the causes of action so united must affect all of the parties to the action, and not require different places of trial, and must be separately stated."

118 Wash. at 159 (quoting REM. CODE § 296).

The plaintiff in *Hames* pleaded a derivative shareholder claim in which he sought to recover, for the benefit of all shareholders, certain excessive expenses, salaries and commissions that corporate officers and trustees were alleged to have paid themselves. *Id.* at 157. His second cause of action was to recover money he had loaned to the corporation, and to foreclose on collateral. *Id.* The court held it "too plain for argument" that the causes of action joined by the plaintiff did not "'affect all of the parties to the action.'" *Id.* at 159. The only other Washington case that cites *Hames* for this holding on joinder is *Harmon & Co. v. Eastern Furniture Co.*, 144 Wash. 16, 22, 255 P. 964 (1927), which likewise held that Remington's Code § 296 did not permit the plaintiff to join claims against different defendants in the same suit, because joinder under the rule was only permitted "where all of the parties to the action are affected by all of the causes of action."

The limitation on joinder provided by Remington's Code § 296 and addressed in *Hames* and *Harmon* no longer exists. Instead, CR 20(a) provides in relevant part:

All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A plaintiff or defendant need not be

13

interested in obtaining or defending against all the relief demanded.

Mr. Holman's joinder of derivative and individual claims is permitted by CR 20(a).

The other cases relied on by Mountain involve the application by the federal district court for the Southern District of New York of its strict conflict jurisprudence under FRCP 23.1. As explained in *Ryan v. Aetna Life Insurance Co.*, 765 F. Supp. 133, 135 (S.D.N.Y. 1991)—one of the only reported decisions cited by Mountain—a dispute existed over whether the courts of the Southern District had formulated a *"per se* rule that prohibits a plaintiff from pursuing simultaneous direct and derivative actions." Plaintiff Ryan not only disputed that a per se rule existed, he also argued that "the weight of authority, largely from other Circuits, is against a *per se* rule." *Id.* The *Ryan* court declined to decide whether a true per se rule existed, but concluded that in applying FRCP 23.1, courts in the Southern District of New York had applied a strict standard in scrutinizing simultaneous direct and derivative actions for signs of actual conflict. It concluded that the plaintiff before it had an actual conflict of interest that would prevent him from fairly and adequately representing the interests of the shareholders as required by the federal civil rule. *Id.* at 135-37.

We are not in the Southern District of New York and are not applying FRCP 23.1, or, for that matter, CR 23.1. And unlike the defendants in *Ryan*, Mountain does not identify any actual conflict of interest on the part of Mr. Holman. Instead, it argues that this dispute between two 50 percent members of an LLC is "not the type of matter suited

14

for resolution by derivative action" and "[t]he proper procedural mechanism for Holman to have utilized was a direct claim against Brady, seeking declaratory relief." Br. of Appellants at 28-29. We disagree. Insofar as Mr. Holman was seeking to enforce a right of Wolf Creek, a derivative LLC member action was a proper way to proceed.

*II. Breach of lease — allegedly ineffective nonrenewal*

Mountain next challenges the trial court's ruling that it failed to give an effective notice of nonrenewal and continues to be bound by the 1998 lease.

When reviewing an order for summary judgment, we engage in the same inquiry as the trial court. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). Summary judgment is proper when a moving party shows there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "Contract interpretation is a question of law only when '(1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence.'" *Dice v. City of Montesano*, 131 Wn. App. 675, 684, 128 P.3d 1253 (2006) (quoting *Tanner Elec. Coop. v. Puget Sound Power & Light*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996)). With respect to the issues presented on appeal, no disputes of material fact have been identified that would prevent contract interpretation as a matter of law.

Under Washington's objective manifestation theory of contracts, "[c]ourts ascertain the parties' intent by focusing on the 'objective manifestations of the

15

agreement, rather than on the unexpressed subjective intent of the parties,' giving terms their ordinary, usual, and popular meaning unless the agreement clearly demonstrates a contrary intent." *Wash. Fed. Sav. & Loan Ass'n v. McNaughton Grp.*, 179 Wn. App. 319, 326, 319 P.3d 805 (2014) (quoting *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005)). When a contract involves repeated occasions for performance, our construction will also take into account any "'sequence of previous performance by either party after an agreement has been entered into,'" that demonstrate a common basis of understanding. *Spradlin Rock Prods. Inc. v. Pub. Util. Dist. No. 1 of Grays Harbor County*, 164 Wn. App. 641, 656, 266 P.3d 229 (2011) (quoting BLACK'S LAW DICTIONARY 405 (9th ed. 2009)).

The general provision on notice included in the parties' lease, Article XXIII, states:

> All notices or demands of any kind required or desired to be given by Landlord or Tenant hereunder shall be in writing and shall be deemed delivered 48 hours after depositing the notice or demand in the United States mail, certified or registered, postage prepaid, addressed to Landlord or Tenant respectively at the addresses set forth after their signature at the end of this Lease.

CP at 60 (Article XXIII).

The trial court concluded that the nonrenewal notice provided by Mountain was deficient in two respects: it was not sent via certified or registered mail and, having been addressed only to "Mr. Brian Brady, President, Northwest Broadcasting, Inc.," at Mr.

16

Brady's Michigan address, it was not provided to the "Landlord." CP at 178.

## A. Manner of delivery

Mountain properly asks that our construction of the agreements at issue in this case not be colored by evidence suggesting that it and Mr. Brady took advantage of contractual provisions in a manner that kept Mr. Holman in the dark and enabled Mr. Brady to unilaterally negotiate a new lease for Mountain. Mr. Holman has claims for relief based on breach of fiduciary duty and breach of the covenant of good faith and fair dealing in which such evidence might be relevant, but those claims are not before us. In construing the lease and the LLC agreement, our objective is to discern the parties' intent in entering into the lease in 1998. *Schorzman v. Kelly*, 71 Wn.2d 457, 460, 429 P.2d 217 (1967).

Mountain contends the lease requirement that notice "shall be in writing and shall be deemed delivered 48 hours after depositing the notice . . . in the United States mail, certified or registered" does not require that the notice be sent by certified or registered mail; it means only that if certified or registered mail is used, the sender may rely on the deemed date of delivery for the time-sensitive notice and demand provisions included in the lease.[11] By being able to rely on a deemed date of delivery, a party will not need to

---

[11] Among time-sensitive notice and demand provisions included in the lease are those requiring notice of nonrenewal under Article II, notice of unsatisfactory condition of premises under Article IV, landlord demand to remove improvements under Article VII, landlord notice of intention to restore destroyed premises under Article XII, notices

determine or establish an actual delivery date.

Wolf Creek contends, and the trial court agreed, that the provision means that certified or registered mail is the only permitted method for giving notice.

Given the plain structure of the provision, Mountain is correct. The critical language is that notices or demands "*shall be* in writing and *shall be deemed* delivered 48 hours after depositing the notice or demand in the United States mail, certified or registered, postage prepaid." CP at 60 (emphasis added). Reading the notice provision as an average person would, and giving the words their ordinary meaning, use of the words "shall be in writing" creates a requirement that the notice be provided in a written form. Use of the words "shall be deemed delivered," by contrast, does not create a requirement, it creates a presumption of delivery.

We recognize that a casual reader might initially read the provision as dictating a required form of delivery, if for no other reason than provisions of this sort often do. But a careful (yet not hypertechnical) reading reveals otherwise.

The trial court erred when it concluded Mountain's notice of nonrenewal was ineffective because it was not sent via certified or registered mail.

---

of default under Article XVI, notice of termination for failure to cure default under Article XVI, and notice of request that tenant provide estoppel certificate under Article XVII.

B.      Delivery "to the Landlord"

Article II of the lease provides for the initial 15-year term and automatic extension for successive 5-year terms

> unless the Tenant shall give notice *to the Landlord* at least ninety (90) days prior to the Extension Date that the Tenant elects that the term of this Lease not be extended (the "Term"), provided however, that such Term shall, in any event, expire on January 12, 2098.

CP at 39 (emphasis added).

Mountain contends that notice addressed to Mr. Brady and explicitly sent to him in his capacity as a 50 percent member-manager of the LLC was "notice to the Landlord" within the meaning of Article II. Mr. Holman contends, and the trial court agreed, that for notice to be given to the landlord, it had to be given to "Wolf Creek," and had to be sent to both Mr. Brady and Mr. Holman.

Article XXIII, the previously-discussed general provision on notice, is the only lease provision that suggests where notice should be sent. It provides that to be deemed delivered within 48 hours, a certified or registered notice should be addressed to the landlord "at the address[] set forth after [its] signature at the end of this Lease." CP at 60. A party could reasonably look to this provision as identifying an effective address for *any* notice, yet no address was set forth under the signature of Mr. Brady, who signed the original lease. The 1999 amendment to the lease did not touch on where notices should be sent, nor was any address for Wolf Creek set forth under the signature of Mr. Holman,

19

who signed the amendment.

The LLC agreement would be a possible source of an address for Wolf Creek. It states that "[t]he address of the principal place of business of the Company is 4600 South Regal Street, Spokane, Washington 99223." CP at 16. But at the time Mr. Rand's September 2012 notice of nonrenewal was sent, Wolf Creek had no presence at that location; the South Regal address was for the television studio property Wolf Creek was leasing to Mountain. If Mr. Rand's letter had been sent to Wolf Creek's principal place of business as set forth in the LLC agreement, then Mountain would have been sending the notice of nonrenewal to itself.

Because Wolf Creek was a single-asset LLC, leasing its only property under a long-term lease, it *had* no place of business as of September 2013. The lease is silent as to where notice "to the Landlord" should be directed.

Mr. Holman argues that Mountain had "consistently" sent correspondence and necessary business information to not only Brady, but also Holman, so its previous performance is relevant in construing the requirement to provide notice of nonrenewal to the Landlord. Br. of Resp't at 30. But of the 10 exhibits in the record that Mr. Holman cites for that proposition, only two—Mr. Rand's 2005 and 2009 letters complaining about the rent—were directed by Mountain to both Mr. Brady and Mr. Holman.[12] And neither

---

[12] Two of the exhibits were e-mail communications between Mr. Brady and Mr. Holman. The remaining six exhibits are appraisal-related communications and materials

piece of correspondence was a notice or demand required by the parties' lease. Two pieces of correspondence over 15 years, neither of which was a notice or demand required by the lease, do not inform our construction of what notice "to the Landlord" under the lease requires.

Here again, we seek to discern what Wolf Creek and Mountain, both Washington LLCs, intended to require in entering into the lease in 1998. Each was member-managed and owned by two members.

Present and former provisions of chapter 25.15 RCW dictate some requirements for organizing and operating an LLC, contain a number of default provisions on matters in the event an LLC agreement is silent, but largely permit members of an LLC to fashion their own agreement. *See, e.g.*, former RCW 25.15.050 (1994); current RCW 25.15.018; former RCW 25.15.800(2) (1994); and current RCW 25.15.801(2). In discerning the intent of the parties as to who could initiate or respond to business contacts on behalf of each LLC, we consider both the statutes in effect at the time, the parties' LLC agreements, and, whether Mountain was aware of any limitations on member authority provided by Wolf Creek's LLC agreement.

---

created between January 6 and February 15, 2012, that, on their face, do not appear to have been provided to Mr. Holman. Mr. Holman's declaration, to which they are appended, describes them as information "provided to me by Defendants during discovery, and from [the appraiser] in response to a subpoena." CP at 421. Elsewhere in his declaration, Mr. Holman states that "[u]ntil November 30, 2012, I was unaware of the appraisal that was done in January 2012." CP at 422.

21

We begin with the relevant statutes. At the time notice was given, former RCW 25.15.150(1) (1996) provided that for a member-managed LLC, "Management of the business or affairs of the limited liability company shall be vested in the members; and . . . each member is an agent of the limited liability company for the purpose of its business." As discussed in further detail below, the statute allowed restriction of the management right of members in the LLC agreement and provided that a third party who was aware of such a restriction could not enforce the restricted member's unauthorized agreement. Wolf Creek's LLC agreement, of which Mountain, through Mr. Brady, had notice, provided in its Management provision, Article V, that

> Section 1. <u>Management.</u> The Company will be operated by the members and no manager will be appointed. No member, nor any group of members not including all the members of the Company, shall have continuing exclusive authority to make independent management decisions.
> Section 2. <u>Authority of Members to Bind Company.</u> All members of the Company shall have the authority to obligate or bind the Company in connection with any matter.

CP at 20.

The LLC agreement thus did not negate each LLC member's statutory agency for the LLC except to provide, as to "Management," that no member (or group) had "continuing exclusive authority," and, as to "Authority of Members to Bind Company," that the authority was vested in "all members."

The 1998 lease does not require that a notice of nonrenewal be accepted by Wolf Creek in order to be effective. In passively receiving notice, Mr. Brady did not make a

22

decision for Wolf Creek, or obligate it, or bind it. Since each member of Wolf Creek was an agent of the LLC for the purpose of its business except as limited by the LLC agreement, and the Wolf Creek LLC agreement did not limit a member's agency to receive notice, the inferable intent of the parties to the lease was that notices and demands could be directed to a single member-manager of the landlord or tenant. Nothing in the lease suggests otherwise. And since each LLC could and might admit additional members, common sense suggests that no one intended that a party giving notice would be required to determine the identity and whereabouts of all of its contra party's current members and dispatch notice to every one of them. A principle we bear in mind in construing contracts is to favor a reading that will avoid an absurd or unreasonable result. *Lawrence v. Northwest Cas. Co.*, 50 Wn.2d 282, 285, 311 P.2d 670 (1957).

Having determined that notice to Wolf Creek could be directed to its member-manager and agent Mr. Brady, we turn to Mr. Holman's argument that the notice was not addressed to Wolf Creek. We find no problem with the fact that it was sent to Michigan, where Mr. Brady lives, since no business address for Wolf Creek existed, and no deemed address for serving notice on Wolf Creek had ever been identified. We understand Mr. Holman to argue that even if directed to Mr. Brady in Michigan, the notice should have included an address block of the following sort:

23

Wolf Creek Holdings of Spokane, LLC
Attn: Mr. Brian Brady, member
2111 University Park Drive
Suite 650
Okemos, Michigan 48864

We see no substantive difference between that and Mr. Rand's letter to Mr. Brady, which opened with the statement, "I am writing you in your position as a member of Wolf Creek Holdings of Spokane LLC." CP at 178.

Because Mr. Brady's statutory agency to accept notice was not limited by the Wolf Creek LLC agreement and the parties' lease did not impose the technical address requirements urged by Mr. Holman, the trial court erred when it concluded that Mountain's notice of nonrenewal was ineffective because it was sent only to Mr. Brady.

*III. Breach of LLC agreement — unilateral execution of lease*

Mr. Brady's next assignment of error is to the trial court's summary judgment ruling that the lease between Wolf Creek and Mountain executed by Mr. Brady in January 2013 is invalid because Mr. Brady entered into it without disclosing its terms to Mr. Holman and obtaining his consent. Here, we agree with the trial court.

After providing that "each member [of a Washington LLC] is an agent of the limited liability company for the purpose of its business," former RCW 25.15.150(1) goes on to provide that

24

the act of any member for apparently carrying on in the usual way the business of the limited liability company binds the limited liability company *unless the member so acting has in fact no authority to act for the limited liability company in the particular matter and the person with whom the member is dealing has knowledge of the fact that the member has no such authority.*

(Emphasis added.)

Addressing authority to act, former RCW 25.15.150(1) provides that "the members shall have the right and authority to manage the affairs of the limited liability company and to make all decisions with respect thereto," with that right and authority "[s]ubject to any provisions in the limited liability company agreement or this chapter restricting or enlarging the management rights and duties of any person or group or class of persons." Since the members of Wolf Creek made complete provision for Management in Article V of their LLC agreement, it is that provision that controls whether Mr. Brady had the actual authority to act for Wolf Creek in negotiating and reaching agreement on new lease terms with Mountain.

The relevant provision of the LLC agreement is Section 2 of Article V, which states, "All members of the Company shall have the authority to obligate or bind the Company in connection with any matter." CP at 20. While Section 1 of the article deals more generally with operation of the LLC and management decisions, at issue here is authority to bind the LLC, so Section 2, as the more specific provision, controls. *Diamond "B" Constructors, Inc. v. Granite Falls Sch. Dist.*, 117 Wn. App. 157, 165, 70

25

P.3d 966 (2003) (a specific contract term controls over a general term). The parties dispute whether "all members" in Section 2 means any member (Mountain's contention) or all members acting collectively (Mr. Holman's).

In *Perkins Coie v. Williams*, a case involving statutory construction, the court stated that "[t]he plain and ordinary meaning of [the word 'all'] is '[b]eing or representing the entire or total number, amount, or quantity.'" 84 Wn. App. 733, 737, 929 P.2d 1215 (1997) (third alteration in original) (quoting the *American Heritage Dictionary of the English Language* 47 (3d ed. 1992)). It is particularly clear that "all" members should be plainly read to mean "the entire or total number of members" in the case of the Wolf Creek LLC agreement, because elsewhere in the agreement—where the intent is to authorize any one of the LLC's members to act on its behalf—the term "any member" is used. CP at 33 (Article XIII, Section 1, authorizing "[a]ny member" to execute and deliver certain agreements for and in the name of the LLC). The use of the phrase "all members" in one provision of the lease and the phrase "any member" elsewhere implies an intent that they have different meanings. To conclude otherwise fails to give effect to each provision of the contract. *State Farm Mut. Auto. Ins. Co. v. Ruiz*, 134 Wn.2d 713, 721, 952 P.2d 157 (1998) (citing *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 734, 837 P.2d 1000 (1992)).

Finally, requiring agreement by two 50 percent member owners in order to obligate the LLC is a more reasonable approach to the challenge of equal ownership than

26

is the alternative of equal rights in each member to bind the LLC to conflicting agreements with different parties. Implicit in the principle that we construe contracts to avoid absurd or unreasonable results is the belief that the parties do not intend to create unworkable agreements.

Despite the Management provision that authority to obligate Wolf Creek resides in "all members," Mountain asks us to consider three other provisions it contends support its position that Mr. Brady could unilaterally commit Wolf Creek to a new lease. All three are inapposite.

Mountain points to Article IV of the LLC agreement, dealing with Voting, which controls the voting power of members. Subsection 2(a) of the Article requires majority approval of matters required by former chapter 25.15 RCW to be approved by members, and Subsection 2(b) requires majority approval of five actions that would alter members' rights, obligations, or interests provided by the LLC agreement. Because entering into a lease does not fall within the member actions requiring majority approval under Article IV, Section 2, Mountain argues that Mr. Holman's agreement to the 2013 lease was not required.

The argument conflates management authority with ownership rights. The distinction is clear in a corporation, in which the management group will ordinarily be different from the shareholder group. Even in a closely-held corporation, where the two groups will be overlapping or conceivably identical, management action is taken wearing

27

a management hat (e.g., director, committee member, or officer) and pursuant to management processes, while owner action is taken wearing an owner hat (shareholder), pursuant to shareholder action processes. In a member-managed LLC, the management group and the owner group will be identical and members will not have two hats, but the distinction between the members-as-managers' conduct of business and members-as-owners' approval of organic changes still obtains. This is reflected in former chapter 25.15 RCW, which addresses management of an LLC at former RCW 25.15.150 and separately (and differently) addresses voting rights at former RCW 25.15.120 (1994). Wolf Creek's LLC agreement likewise addresses management and voting distinctly and differently in its Article IV (Voting) and Article V (Management). It is Article V, dealing with the members-as-managers' conduct of business, that controls when agreement to a lease is at issue—not Article IV.

Mr. Brady next points to Article XIII, Section 1 of the LLC agreement, dealing with execution of documents, which provides that "[a]ny member . . . shall have the power to execute and deliver . . . leases . . . for and in the name of the Company." CP at 33. As used in Article XIII, "execute" means "To make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form <each party executed the contract without a signature witness>." BLACK'S LAW DICTIONARY 689 (10th ed. 2014). When read together with the other provisions of the LLC agreement, this provision delegates ministerial execution authority. Otherwise, Article V, dealing

28

with Management, would be superfluous—and one of the principles we apply to ascertain the intent of contracting parties is to harmonize all of the provisions of a contract so that none is rendered superfluous. *Nishikawa v. U.S. Eagle High LLC*, 138 Wn. App. 841, 849, 158 P.3d 1265 (2007). Authority to execute an agreement is not equivalent to authority to approve it. *See, e.g., Askinuk Corp. v. Lower Yukon Sch. Dist.*, 214 P.3d 259, 265 (Alaska 2009).

If Mr. Brady had been dealing with a third party that reasonably believed or assumed that he would only execute the lease if it had been approved by all Wolf Creek's members, Mr. Brady's authority to execute a lease on behalf of Wolf Creek could bind the LLC. Former RCW 25.15.150(1) (ordinary course action by a member-agent binds the LLC unless the member-agent lacks authority and the third party knows it); *and see* RESTATEMENT (THIRD) OF AGENCY, § 3.03, cmt. b (AM. LAW INST. 2006) ("[I]f a principal has authorized an agent to communicate the principal's decisions to a third party, the third party may reasonably believe the agent's reports. Reasonable belief is not defeated by the third party's knowledge that the agent could not unilaterally make the decision that is the focus of the communication to the third party."). But here, Mountain could not reasonably believe that the 2013 lease had been approved by all of Wolf Creek's members. Mr. Brady, who controlled Mountain, knew it had not been.

Finally, Mr. Brady points to Article VI of the LLC agreement, which deals with Interested Member transactions, and provides that they are not void or voidable in two

instances, one being that "[t]he contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified by the members or the committee thereof." CP at 21 (Article VI, Section 1(b)). The other instance is where the transaction is approved, following disclosure of a member's interest, by a majority of disinterested members. *See* CP at 20 (Article VI, Section 1(a)). Mountain argues that Wolf Creek can avoid the 2013 lease only if it proves that it was unfair to the LLC at the time it was executed.

Washington cases have long held in the context of corporate transactions that the "'general rule of agency which prohibits an agent from representing both himself and his principal in a transaction in which their interests are adverse and antagonistic fully applies where a corporate officer or director attempts to represent both himself and a corporation in a transaction in which his and the corporate interests are adverse and antagonistic.'" *Lycette v. Green River Gorge Inc.*, 21 Wn.2d 859, 865, 153 P.2d 873 (1944) (quoting 13 AM. JUR. § 1002, p. 955). As a result, an interested director or officer transaction can be set aside. *Id.* The same general rule of agency could apply to Interested Member transactions with an LLC but for the fact that in enacting the LLC act in 1994, the Washington Legislature provided that "[e]xcept as provided in a limited liability company agreement, a member or manager may . . . transact . . . business with a limited liability company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a person who is not a member or manager."

30

Former RCW 25.15.035 (1994).[13] Article VI, Section 1 of Wolf Creek's LLC agreement merely responds to its statutory authority to limit Interested Member transactions that the statute would otherwise allow. It allows Interested Member transactions that either get the required informed, disinterested member approval or that prove to be fair.

In doing so, Article VI does not supplant the general Management provision at Article V. Rather, it identifies *additional* approval requirements that apply solely to Interested Member transactions. Article V, Section 2 still applies, requiring that "all members" act in order to obligate or bind the LLC.

The trial court correctly concluded that Mr. Brady lacked authority to agree unilaterally to the 2013 lease terms. Because Mountain had knowledge through Mr. Brady that he lacked authority to agree to the new lease terms, Mr. Brady's execution of the lease does not bind Wolf Creek.

### *IV.    Form of judgment and attorney fees on appeal*

Mountain's final assignment of error is to the trial court's entry of a money judgment in favor of Mr. Holman rather than in favor of Wolf Creek. Wolf Creek was the party to the lease with the attorney fee provision, and it was on Wolf Creek's behalf that the breach of lease claim was asserted derivatively. Yet, it is Mr. Holman, not Wolf

---

[13] Modern statutes also provide that corporate directors' conflicting interest transactions cannot be set aside if they are approved in compliance with prescribed procedures or are proved to have been fair. *See, e.g.*, RCW 23B.08.710(2), .720, .730.

31

Creek, who advanced the attorney fees and costs incurred in pursuing the derivative claim.

Mr. Holman responds that cases construing the Uniform Limited Liability Company Act hold that a member-plaintiff who brings a successful derivative action is entitled to indemnification for the reasonable expenses individually incurred. Br. of Resp't at 48. That does not explain why Mr. Holman's judgment should not lie against Wolf Creek, however. And since original adoption of chapter 25.15 RCW predated approval of the 1996 Uniform Limited Liability Company Act by two years, an argument from a case that construes the uniform act, without more, is unpersuasive.[14] 6B UNIFORM LAWS ANNOTATED at 545 (2008); *but cf. Dragt v. Dragt/DeTray LLC*, 139 Wn. App. 560, 575, 161 P.3d 473 (2007) (stating that the former Washington act "is modeled substantially on the Uniform Limited Liability Company Act (ULLCA), 6A U.L.A. 568 (1996)"); *Chadwick Farms Owners Ass'n v. FHC, LLC*, 166 Wn.2d 178, 187 n.2, 207 P.3d 1251 (2009) (same; relying ultimately on *Dragt*).

---

[14] According to a contemporaneous law review article,

The Washington Limited Liability Company Act, as it was originally proposed, was drafted by the Partnership Law Committee of the Washington State Bar Association's Business Law Section. Because a model LLC statute is not yet in existence, the drafters examined various state statutes before submitting one for consideration by the legislature. Washington's provisions were modeled primarily after the Delaware LLC statute.

Jessica A. Eaves, *A Step in the Right Direction: Washington Passes the Limited Liability Company Act*, 18 Seattle U. L. Rev. 197, 204 (1994) (footnote omitted).

Former RCW 25.15.385 applies, and provides that "[i]f a derivative action is successful, in whole or in part, . . . the court may award the plaintiff reasonable expenses, including reasonable attorneys' fees, *from any recovery in any such action or from a limited liability company*." (Emphasis added.) The "plaintiff" in a derivative LLC member action is the member, not the LLC. Former RCW 25.15.370, .375. Former RCW 25.15.385 thus authorizes court-ordered indemnification of Mr. Holman by Wolf Creek or against Wolf Creek's "recovery in [the] action" for the attorney fees and costs he advanced.

The 1998 lease provides

> If Tenant or Landlord shall bring any action for any relief against the other, declaratory or otherwise arising out of this Lease, including any suit by Landlord for the recovery of rent or possession of the Premises, the losing party shall pay the successful party all costs and reasonable attorney's fees which shall be incurred whether or not any such action is prosecuted to judgment.

CP at 60 (Article XXIV). Wolf Creek was entitled under the 1998 lease to recover from Mountain all of Mr. Holman's fees and costs that it was court ordered to indemnify, since the action brought on its behalf successfully asserted a breach of Mountain's obligation to pay rent at the holdover rate. Since former RCW 25.15.385 authorizes an award of fees to the plaintiff "from any recovery in any such action," we hold that the trial court could effectuate the award and recovery by entering a money judgment against Mountain, in favor of Mr. Holman.

33

Mr. Holman, individually and on behalf of Wolf Creek, seeks an award of reasonable attorney fees and costs on appeal. When a party is entitled to fees on the underlying action based on a statutory or contractual provision, it is similarly entitled to fees on appeal. RAP 18.1; *Renfro v. Kaur*, 156 Wn. App. 655, 666-67, 235 P.3d 800 (2010). We award Mr. Holman and Wolf Creek reasonable fees and costs on appeal subject to compliance with RAP 18.1(d). If it is demonstrated that Mr. Holman has advanced the fees and costs on appeal, our commissioner may make the award to him.

We reverse the trial court's partial summary judgment determination that the 1998 lease between Mountain and Wolf Creek was automatically renewed, affirm its partial summary judgment determination that the new lease signed by Mr. Brady in 2013 was invalid, and remand the case to the trial court for further proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____          _____
Fearing, C.J.                                          Korsmo, J.

34